We have two panels this morning, four argued cases and a submitted case. Our first panel will hear one oral argument, and then at the conclusion of that oral argument the panel will retire, and then we'll come back in a few minutes to hear the remaining cases of the morning with a new panel. So we'll start with the lone appeal of the first panel, VernetX v. Cisco Systems, docket number 18-1751. And whenever you're ready. Thank you, Your Honor. May it please the court, Stephen Kinnaird for VernetX. I begin with Claim 5, where the board's failure to reach a critical argument requires remand. Claim 5 recites a domain name service system, or DNSS, that, quote, is configured to authenticate the query using a cryptographic technique. The examiner ruled that the cell directory service of Lendenman, the counterpart to the DNSS, performs cryptographic authentication by remote procedure call, or RPC. On appeal to the board, VernetX argued first that the CDS does not perform authentication at all, the security service does. And second, that independently, the CDS does not use RPC. Does the security service use RPC? No. These are the core utility services, security and CDS. I have a little trouble following all of this, but just let me see if I understand that you have two arguments here. One is, you think there are two different functions in Lendeman, and the one that's comparable to yours doesn't do the cryptographic stuff at all. And then you say that whatever function they're pointing to is done by a separate service. If we disagree that those two things are separate services, though, it seems like you just said you have a backup argument that that thing you think is separate still doesn't do RPC. Yeah. The CDS does not do RPC. No, not the CDS. Is the CDS the security service? They're separate functionalities. No, that's what I'm trying to get at. So maybe you can just help me. Is the CDS the comparable thing to the DNS in your, is that what the idea is? Yes, yes, and that's what was alleged. Right, okay, but there's a separate thing in Lendeman called a security service. What I'm asking is, is the security system using any kind of cryptographic or RPC function in Lendeman? What the security service does is it performs the authentication. It doesn't use RPC, right? It supplies a session key by which clients and remote servers can engage in RPC. But the key point is that we have the argument that the CDS... No, I understand. I think your key argument is that those are two separate functions, but what I'm trying to get at is if I disagree with you that those are two separate functions and I view it all as one entire function, whether you still have an argument that there's no RPC at all? Well, the RPC... I guess the security service is involved in the authentication in an RPC, but the holding of the examiner was that the CDS, just looking at the CDS, actually uses the RPC. And the expert, Karamaitis, made very clear, and this is at 6985, he's the only expert, he says that the CDS is used for establishing an RPC and therefore it doesn't use the RPC. And Lendeman itself says, 4439, that the CDS is involved in the execution of RPCs. And it explains that the client has to query the CDS to locate the remote server and then to receive what's known as a partial binding handle just to communicate with the remote server. So because the CDS is necessary to create an RPC, the CDS cannot be said to actually use an RPC. And this is critical because the RPC, the authenticated RPC, is the sole disclosure in Lendeman of cryptographic authentication of the message. So the security service provides a session key and then the client and remote server use that session key to decrypt and encrypt messages and to authenticate. But it's not the CDS itself that uses the RPC. So there is no disclosure in Lendeman of CDS performing cryptographic authentication of queries for network address. Because the board did not reach this argument, there has to be a minimum of remand on Claim 5 and also on Claims 11 and 12, which also turn on this RPC performance question. If it's not the CDS, then which unit is using RPC in Lendeman? Is it the security service? It's the clients and the remote servers. The application servers is what the disclosure is. So the security service and the directory service are these core utility services that enable the RPC. And the CDS process of querying is disclosed at 42.95 to 96. It is a separate process from the RPC. And again, it would be a non sequitur to say that if you need a CPS to create an RPC, that the CDS uses RPC. So the board also erred in finding that the prior art disclosed the indication limitation of the claims. And it did so based on a misconception that if the DNSS performs any but-for step prior to the formation of a secure communications link by other components, that's the claimed indication. And that's not true because the claims require an indication that the DNSS itself support establishing a communication link. And this is, for example, Appendix 100, which has step 3410 and figure 34. And it indicates that the DNSS provides the parameters for the VPN to the client and host. And that's the innovation of the patent, is to use the DNSS to automate secure communications links. And there's no substantial evidence that either Aziz or Lendonit discloses the claimed indication. So Aziz is simply a variation on the standard internet practice. It's set forth in what's known as RFC 2065. It's referenced in Aziz at 4534. And so in standard practice, a network administrator would simply register with a DNS public key and digital signature or SIG records. And then any time that a client requests the network address for a host or a firewall, then those public records are returned. It's simply a return of public records. And all that Aziz adds is it creates a new type of record called the SX record for secure exchanger like a firewall. And so it says when you get such a query, you also add in an SX record with the public key and address of the firewall. So again, an SX record is just a couple lines of information on the response from the DNS. But what that is, is simply like the conventional art, is the return of a public record to any client. And the patent specifically admits that the prior art does that on column 39. But if the record that comes back from a secure server, let's say, is in fact a record that rather than simply an unavailable can't return any data, then that is, I won't use the word indication, but that demonstrates, does it not, that there has been a secure link established. No, Your Honor. It's important to understand that the SX record does not come back from a secure host. The SX record comes back from the DNS. And it simply gives you the address of a firewall, which is there. And the patent in column 39 specifically admits the prior art returns network addresses and it returns public key of firewalls. Okay, well, how does that differ from Lendenman? Does Lendenman not do exactly that? Lendenman does the same thing as Aziz, and it is, it is... So it's not, what you get back in Lendenman is not data from the secure site, you say? No, all Lendenman, and I should point out that the issue of Lendenman is also at issue in the related 211 patent in the 171591 appeal that's already been argued as separately pending. But all that Lendenman does is that there are two claimed indications. The first is simply that the CDS returns a network address in response to a query. That's what any DAME server does. And that could be, you know, a secure site or it could be just a regular site. But it does it regardless. All it's doing is returning the public record. It's kind of just an administrative function that it does. The second indication in Lendenman that the board relied on was what's known as the access control list. And that's even farther afield because all the ACL does is that when you want to make a query of the CDS, first the CDS checks to see whether you're authorized to make that query, to access that name, or perform CDS operations. So it's a step before the return of the network address. You do it regardless of whether you're seeking secure or non-secure communications. And the fundamental difference with the patent is this, the patent, the invention, the DNSS... But I guess with the access control lists, if you are one of those authorized clients, then you will get an IP address returned to you. And if you're not one of those authorized clients, then you're not going to get access to an IP address. And that's true whether you're trying secure or non-secure. So it's just... But I guess the point is, if you are getting an address in that context, then that proves that you're authorized. And then perhaps that's some kind of indication that, okay, this system can handle secure communication systems, because that's the only kind of communication link you're going to get. And then if you're denied an IP address, that's also an indication that you, client, haven't been authorized. And so therefore, you're not going to get a secure communication link. It's an important distinction. All the ACL does is, are you authorized to use the CDS, right? And for certain functions. It is not about, are you authorized to engage in secure communications? And this is the fundamental distinction about what the indication, what the claim says, is the indication that the DNSS itself supports establishing the secure communication link. So the DNSS has to be, to contribute to the creation of the link itself. It's just mere public return of the records, which was admitted to be in the prior art. That can't be the meaning of the claim. You interpret the claim in light of the specification, in light of the preferred embodiments, not limiting them to the preferred embodiments, but it sheds scope on it. Mr. Kinnear, you're into your rebuttal. Do you want to save it? Yes, I would. Thank you. Let's hear from the other side. Mr. Foster. Thank you, Your Honors. Good morning. May it please the court, Theo Foster on behalf of Cisco Systems. I'd like to start with what Mr. Kinnear brought up first and his challenge to the question of whether the board found anything regarding the use of remote procedure calls in Londonman. And what the board did was the board affirmed the examiner's rejection of Claim 5. And if we look at the examiner's rejection of Claim 5. Can you point to me where the board incorporated the examiner's rejection of Claim 5. Can you explain this? The board's discussion on this point seems mostly directed at rejecting their argument that the CDS and the security service are two separate functioning entities, but it didn't explain, I don't even think it used the words Yes, that is correct as far as a summary of the words that the board used and the way that they put their opinion. How can we rely on the examiner's rejection if the board didn't at least incorporate it somehow? Well, I believe the Administrative Procedures Act provides that intermediate procedural decisions of an agency are reviewable when the final decision is reviewed on appeal. And so I think the court can look beyond just the words that the board wrote but also look at what the board was reviewing itself and what the examiner said. We still have to have a factual finding. If all we were doing was searching for evidence in the record to support this factual finding, I might be with you. But we still have to have a factual finding that Lindemann meets this specific claim limitation of Claim 5 about the cryptographic information. And can you point to me in the board's decision a factual finding that's sufficient that we could then look to the examiner's discussion and the like for additional evidence about why those functions are bad? So the board's decision affirmed the rejection of Claim 5 and the basis of that rejection included the examiner's statements, and that's on appendix page 2240, the examiner's statements and findings regarding the use of remote procedure call in Lindemann. The board doesn't address the patent owner's argument, though, about why in the patent owner's view the CDS does not use an RPC call. Is that fair to say? The board does not discuss the use of remote procedure call in Lindemann. Right. And so I guess the gap is that the patent owner made a specific argument and the board didn't ever address that argument. And the board, as my understanding, the board is not required to address every single argument raised by a patent owner. So, I mean, yeah, but this is the primary argument by the patent owner about this specific claim. I mean, if we were to take your position to the logical conclusion, the board could write just one sentence opinions and not say anything more. I mean, we don't really have a clue here that the board is saying to us, communicating to you, that it likes what the examiner said and disagrees with what the patent owner is trying to counter. And therefore, that's why the board is affirming the rejection. It's a little more cryptic than that. Well, I mean, what you just pointed to us, that's the examiner's opinion, right? That's the examiner's findings. At least have something to suggest that the board addressed this issue. You're probably not going to. I looked at the board's opinion yesterday and all it seemed to address was the argument that the CDS and the security services are different entities. And it said, no, they're not. They all kind of function together, which is fine. And that was the patent owner's primary argument. Right, I get it, but still the problem is we don't know from the board's decision if they concluded that that security service did RPC. And it doesn't sound from your friend's argument on the other side that that's undisputed. If it was undisputed that the only argument were from their side was the CDC and the security services are different. They're separate. So the security service using RPC doesn't meet this claim limitation, then I think the board's done enough. But it seems like there's a separate argument that the security service doesn't even do RPC at all. And the board didn't speak to that. And I don't know. I can't read this stuff myself and figure out whether the security service does RPC. I mean, that's not my job. The board has to make that factual finding. So again, is there anything in the board's decision? Did I miss something that suggests a hint that they were deciding that issue? The board's approach to this was to affirm the examiner's decision. Can you point to anything in the board's language that suggests they're incorporating the examiner's reasoning on that point? I mean, even that would be good enough, but I didn't see any of that. I don't believe the board referenced incorporating the examiner's analysis. The board reviewed that analysis and found it persuasive and affirmed it. But the board itself did not reiterate the exact same points. They simply affirmed the analysis and addressed the patent owner's primary argument on appeal, which was this question of whether or not the security service and the cell directory service are two separate entities. And of course, the teaching of the reference is that they're integrated and incorporated. Even though the board didn't seem to address it, do you have a clear argument for why the security system in Lindemann meets this claim limitation and uses RPC? Yes. So the key question is whether or not the cell directory service, which corresponds to the claim DNS, whether or not it uses remote procedure calls. And if we look at appendix page 4275, it's quite clear because it states that the directory service, which includes the cell directory service, the directory service is based upon the data sharing model, and the data sharing model is built upon remote procedure call, RPC. That's in section 1.1. This is in Lindemann? Yes. This is in Lindemann, appendix page 4275. It's the last two sentences in the section labeled 1.4.1.3, the data sharing model. It states data sharing is built upon RPC, and then both the directory service and the distributed file system are based upon the data sharing model. So there is the direct statement that the directory service, including the cell directory service, is using RPC. The examiner cited that. The examiner also cited the figure on page 4439 of Lindemann, which shows the directory service in a hierarchy of features being literally built on top of the remote procedure call box. Page 4439 further states that RPC is the basis for distributed computing environment, or DCE, which is the subject matter of Lindemann in its entirety, and states that DCE services also use RPCs. There's substantial evidence here to support the examiner's finding and the board's affirmance. Was that proposition contested before the board? The question of whether RPC is used by these services? Yes, that was in the briefing. It was contested by the patent owner argued that it was not, right? That's correct. The patent owner did raise the argument as its secondary argument. The board, in fact, identified that in its decision, but 828, where it said patent owner argues among other things, quote, CDS does not use the RPC model of communication. And that argument was made before the examiner, right? Yes. Okay. So you want us to infer that with the board recognizing that the patent owner made this very argument, that the board understood that argument and rejected that argument by affirming the examiner's rejection? Yes. And in doing so, must have necessarily adopted the reasoning of the examiner? I believe that it would be sufficient that the board found that the evidence showed and supported the conclusion, whether the board necessarily agreed exactly with the examiner. Now, in this passage that we're talking about, Appendix 28 to 29, the board says, with reference to the Security Service of Linden performing this function, and the board says, we are still not persuaded by patent owner's argument for at least the reasons previously discussed. What do you understand the reasons previously discussed to entail? Well, among the reasons discussed above is this question about the difference between the Security Service and the Cell Directory Service, which the board extensively discussed in the preceding pages. Well, specifically, do you, I guess let me ask the question more pointedly, do you understand that reference to reasons previously discussed to refer to the material on page 11, which is Appendix 24 of the board's opinion in which the scope of Lindenman's disclosure is discussed? In part, yes. Page 11, Appendix 24 is where the board discussed and refuted patent owner's argument regarding the distinction between the CDS and the Security Service. And again, the board referenced the same teachings that the examiner had about Lindenman describing the CDS as integrated into the Security Service. Yeah, but does that, the final question, I guess, is does that get you to the point of saying there's your explanation for the board, reasons for the board rejecting the patent owner's argument on this issue? On the issue of the remote procedure call? On the Claim 5 issue. I think it is, because again, the main argument that patent owner was making on appeal was this distinction between CDS and Security Service, and that's what the board is primarily addressing. The secondary argument that they raised below, and now are trying to promote to be the linchpin of this case, the board simply referred to the fact that the argument had been made and they weren't persuaded, and the examiner had dealt with that extensively. What I take it you're saying is that this material, both on pages 27 and 28, and also the material on 24, if that's incorporated within the board's reference to discussions above, covers the principal argument, but not the secondary argument. Is that what you're saying? I have the same board decision that you do, and unfortunately the board did not address specifically this remote procedure call issue. They referenced it, it was clearly before them, and they considered it. They referenced the fact that it was before them, and they were not persuaded. They affirmed the rejection of Claim 5. I think that's the board's finding that the court can rely on, that the board considered this argument and was unpersuaded, and it's in the record from the examiner exactly why that argument doesn't hold water. What about on Claim 12? Claim 12, we don't see any discussion of RPC in Claim 12, right? And the examiner's theory on Claim 12 is the same thing as for Claim 5, in that the examiner believed that CDS was using an RPC call, right? For Claim 12 as well as Claim 5, and yet here in the discussion of the board's decision as to Claim 12, we don't see any acknowledgment of the crux of the matter, which is, does the CDS use an RPC call or not? And what the board was addressing was the arguments specific to Claim 12 that the patent owner had raised, which were not specific to the remote procedure call. The arguments the patent owner was raising related to the use of Transmission Control Protocol, or TCP, and the question of whether or not that provides a moving window of valid values. And so that language was specific to Claim 12, was what the board addressed in its decision on Claims 12 and 13. I have just a few seconds. I would like to refer to the arguments made regarding the access control list teaching and point out that the patent owner has repeatedly argued to the district court that authorization and authentication are specific features of the claims. They did that to the district court at appendix page 7505. They've even done that again here in their blue brief at page 9, where they reference a specific feature in summarizing the claimed invention as requesting that the DNS server determines whether the requesting computer is authorized to access the site. So authorization is provided by the ACLs in Lindenman and was a specific feature argued by patent owners as meeting this claimed indication limitation. If there are no further questions, thank you. Okay, three minutes. Your Honor, I'd like to address first this whole notion of the CDS being integrated into the security service. If you look at appendix 4300, the basis for that is where it says the CDS, as any other DCE service, is integrated into the security service, which only means that all DCE services can call on the functionality of the security service. It does not mean that they're the same and that the CDS, all the functions of the security service are attributable to the CDC. And I would say even though there's a dispute about whether the CDS performs authorization, there is no disclosure anywhere with any kind of cryptographic authentication of a CDS query. It has to be an authenticated user, but there's no reference in any CDS query, so even if it was the security service, that there's cryptography involved. Cryptographic authentication is only revealed with authenticated RPC in Chapter 10, and that is not the CDC process. And I would note that in 2242, if you look at the actual examiner's decision when they're talking about RPC, they're talking about whether the CDS performs RPC. So if there's any theory of integration, you know, I think that has to be something that would be explored on remand. On whether or not you can rely just on the examiner's findings, I think that's not correct. This court has held the board makes de novo findings. It's an appeal in the sense that it's limited to the record, but like, you know, under the Administrative Agency Act, it either has to incorporate those findings or make them themselves. There is no such finding with regard to the remote procedure call. And on the data sharing model that my brother alluded to, first of all, that's an argument for the board, not for this court, but I would point out that when they talk about in general that distributed computing is based on RPC, of course. But it also says most DCE services use RPC. It doesn't say all of them. And it pointedly has a different procedure for CDS. And so for all these reasons, I think this court should remand on Claim 5, 11, and 12, and then on Claim 1 should reverse for lack of substantial evidence. Okay, thank you very much.